## The People v. William Gallagher.

*Criminal law—Accomplice—Privileged communications—Impeachment — Robbery — Criminating question — Admissions of respondent—Constitutional law—Authority of Wayne circuit judge to preside in recorder's court.*

1. An accomplice who turns *state's evidence* must make a full disclosure, and statements made to his attorney are not privileged, but cannot be admitted in evidence to impeach him unless his attention is called to them when on the stand.

2. A person charged with a crime can be convicted, in this State, upon the uncorroborated evidence of an accomplice.

3. If *one* of *several* respondents *jointly* engaged in a robbery was armed with a dangerous weapon, *all* may be convicted of the statutory offense.

4. Where a witness testifies fully on his direct examination, and refuses to answer a fair question on cross-examination not in any way directed against his character, or put for the purpose of impeachment, or to affect his credibility because of any wrong or criminal act on his part, on the ground that such answer may criminate him, it is not error for the court to *refuse* to instruct the jury that such refusal must not be considered as in any way discrediting his testimony, nor to charge them that they could give it such credit as they think it deserves.

5. The admissions of a respondent may be shown by his testimony given on the trial of a co-respondent for the same offense.

6. The right to show the contradictory statements of a respondent, in reference to any material fact affecting his guilt or innocence, is not affected by his *not* being sworn as a witness in his own behalf on the trial.

7. Act No. 456, Local Acts of 1887, authorizing either of the judges of the circuit court for Wayne county to act as judge of the recorder's court of the city of Detroit, on request of the recorder, etc., is constitutional, as far as it affects cases of which the circuit court had *original* jurisdiction before the passage of the act.

8. A simple request by the recorder is all that is necessary to give a judge of the Wayne circuit court authority to act as judge of the recorder's court of the city of Detroit under the statute, and

in the absence of a contrary showing the right of a judge so *assuming* to act will be presumed. *Landon v. Comet*, 62 Mich. 92.

Error to the recorder's court of the city of Detroit. (Gartner, J., presiding.) Argued April 23, 1889. Decided June 28, 1889.

Information for robbery, being armed with a dangerous weapon. Respondent was convicted, and sentenced to 25 years' imprisonment in the State prison at Jackson. Judgment affirmed. The facts are stated in the opinion.

*Sylvester Larned* and *D. Augustus Straker*, for respondent.

*George F. Robison*, prosecuting attorney, for the People.

MORSE, J. On the evening of January 3, 1887, Capt. Ira F. Holt, an old and esteemed citizen of Detroit, nearly 60 years of age, was, on his way home and in the residence portion of the city, attacked by four men, violently beaten, and robbed of a gold watch.

The respondent was arrested, with others, for the crime. He was informed against for robbery, being armed with a dangerous weapon, convicted, and sentenced to 25 years' imprisonment in the State prison at Jackson.

He was convicted chiefly upon the testimony of Joseph Coveyeau, an accomplice, although there was some circumstantial evidence looking towards his guilt.

Errors are alleged as having occurred on the trial, and he asks a review of the same in this Court, claiming that he is entitled to a new trial by reason of such errors.

Charles Flowers, an attorney, was examined as a witness on behalf of the defendant. Coveyeau had been, prior to the trial of respondent, tried and convicted for a burglary, committed on the same night as the assault upon Holt, and claimed by the prosecution to have been committed by the

identical four persons who robbed Capt. Holt, towit, Cov-
eyeau, Gallagher, Preston, and Hartnett.

Flowers defended Coveyeau in the burglary case, and it
was sought by the defense to contradict the testimony of
Coveyeau, given upon the trial of respondent, by showing
that in his statements to Flowers, while he was his attorney
in the burglary suit, he named his accomplices in the rob-
bery of Capt. Holt, and did not mention either Gallagher or
Preston as being concerned therein, and by other statements
exonerated the respondent from any part therein.

Mr. Flowers refused to answer some of the questions upon
the ground of privilege, and the circuit judge ruled that he
could use his own discretion as to answering them.

Upon the theory of the prosecution, and according to the
testimony of Coveyeau, the men who assaulted and robbed
Capt. Holt went almost immediately from the place of the
robbery to the Moross house, where the burglary was com-
mitted, and each was the work of the same four men.   Con-
sequently on both trials the two transactions were necessarily
more or less connected and involved in the evidence.   There
can be no doubt, from all the circumstances shown by this
record, but that Coveyeau was a participant in both crimes.
He was arrested watching in front of the Moross house, while
the burglary was going on, and before his seizure was seen to
throw away a watch, which was found, and proved to belong
to Capt. Holt.   One of the officers who came upon the burg-
lars while they were in the house, and fired at them as they
ran out, identified Gallagher as being one of them.

These statements of Coveyeau, therefore, made to his
attorney while on trial for the burglary, as to who, with him-
self, committed the robbery, were upon a subject legitimately
and necessarily connected with and relating to his defense in
that suit.

The question arises, can these statements, made under

such circumstances, be used upon another trial to show that Coveyeau is testifying falsely or guilty of perjury therein?

The counsel for the respondent contend—

1. That the privilege of declining to answer is not the privilege of the attorney, but of the client; and that Coveyeau, having turned state's evidence, and attempted to convict others by proof also convicting himself, must be deemed to have thereby waived all privileges which would permit him to withhold anything, and therefore Mr. Flowers should have been compelled by the court to give in evidence such parts of the communication of respondent to him, while he was his attorney, as the defense desired, or the whole of it, if demanded by either side.

2. The statements of Coveyeau to Flowers, as to who with himself committed the robbery, could, under no circumstances, be considered privileged, as the privilege exists for lawful purposes only.

Coveyeau, when on the stand, testified that he had a conversation with Mr. Flowers in the jail. This was in answer to a question put to him by the defense on cross-examination.

The question was raised by the prosecution that the conversation was privileged, and the court said that he must answer, but, if they put Mr. Flowers on the stand to rebut the answers, then the question of privilege might be argued. Thereupon Coveyeau answered the question, stating that he mentioned the subject of his accomplices to Flowers, but did not say who they were, and denied making the statement to Flowers that the men who were with him in the robbery were from Chicago, and that he had named Gallagher and Preston to the prosecution as being with him, because he knew they would have no trouble in clearing themselves.

It is admitted by Mr. Robison, upon the part of the people in the argument before us, that the ruling of the court was erroneous, and that Mr. Flowers was a competent witness for the purpose of impeaching Coveyeau.

This Court said in the case of *Alderman v. People*, 4 Mich. 422, 423:

"It is a rule of law that no witness shall be required to answer any question that may tend to criminate himself, yet the accomplice, when he enters the witness-box with a view of escaping punishment himself by a betrayal of his co-workers in crime, yields up and leaves that privilege behind him. He contracts to make a full statement,—to keep back nothing,—although in doing so he may but confirm his own guilt and infamy. If he fails to do so in full, if he knowingly keeps back any portion of the history of the crime he undertakes to narrate, he forfeits his right to pardon, and may be proceeded against and convicted upon his own confession, already made. We think an accomplice who makes himself a witness for the people should be required to give a full and complete statement of all that he and his associates may have done or said relative to the crime charged, no matter when or where done, or to whom said. He should be allowed no privileged communications." See, also, *Foster v. People*, 18 Mich. 265; *Hamilton v. People*, 29 Id. 173.

It is also well settled that the privilege is that of the client, and not of the attorney. Therefore, if the client waives it, the attorney cannot insist upon it.

We are satisfied that in the case of one who has admitted his connection with a crime, testifying against another as his accomplice, not only the people, but the defense, are entitled to the whole story, and to all that the witness has said or done in relation to the offense up to the time of the giving of his testimony, including confidential communications to his attorney. As far as the crime in question is concerned, he has, by going upon the stand and acknowledging his participation in it, waived all privilege as regards it, as the reason of the privilege has been removed by his own act. And if he should be shown by such communications to have committed perjury, even on such trial, these communications, being made in reference to another crime than perjury, and before the perjury is committed, stand upon the same footing as any other statements made out of court before or during such trial, as they were only privileged in reference to a crime which he has admitted, and offered to make a full.

breast of, and not in reference to some crime that he might commit in the future, but had no thought of when the statements were made.

But the statements made by Coveyeau to Flowers could not be admitted in evidence to impeach him, except in the same way that other statements of his out of court would be admitted. It was his right, and the right of the prosecution, to have his attention called to them before they could be admitted.

A careful examination of the record shows that the claim of the people on the argument here is correct, that Mr. Flowers, although taking his supposed privilege upon some questions put to him, did in the end answer every material question relating to any matter of such communications to which the attention of Coveyeau had been directed, and that he corroborated the testimony of Coveyeau in so far as he gave evidence to any fact or statement of which inquiry was made of Coveyeau.

The only material questions asked Coveyeau about his conversation with Mr. Flowers were these:

"*Q.* Did you have a conversation with Charles Flowers in jail?

"*A.* Yes, sir.

"*Q.* At or about the time it was reported that you had told who your accomplices were?

"*A.* Yes, sir.

"*Q.* And did you have a conversation with him in reference to whom your accomplices were?

"*A.* No, sir.

"*Q.* Did you have a conversation with him in jail?

"*A.* I had a conversation with Mr. Flowers in jail.

"*Q.* Now, I put the question, did you have a conversation with him in regard to who your accomplices were?

"*A.* I did not say who they were; I just merely spoke about the subject.

"*Q.* Did you have any conversation with him in the jail?

"*A.* Yes, sir; something to that effect.

"*Q.* Did you there state to him that you answered hastily; that the men who were with you were strangers to the police;

that you named the men that you had, Gallagher and the other, because you knew it would be so easy for them to clear themselves?

"*A.* I made no remark of that kind.      *      *      *

"*Q.* Did you say, in substance,—I don't care about the words,—did you not say, in substance, when Mr. Flowers reproved you for making any such statement,—did you not say to him: ' They came to me, and in a hurry I named the men; the men who were with me were strangers to the police, but I named these men, because I knew they would have no trouble in clearing themselves?'

"*A.* I didn't say that.      *      *      *      *      *      *

"*Q.* What did you say to him about your accomplices being strangers here?

"*A.* I don't remember saying anything of that kind.

"*Q.* From Chicago—Did you say to him that you named those men because you was in a hurry, it was put upon you, and you knew they could clear themselves?

"*A.* I don't remember making any such remarks.

"*Q.* You swear you didn't say that?

"*A.* Yes, sir.      *      *      *      *      *      *      *      *-

"*Q.* Did you, then, tell him that you had given the names of two men, but they never could be convicted; did you tell him that?

"*A.* I don't remember.

"*Q.* Just now you said you didn't remember. Do you swear you didn't say so?

"*A.* I swear I didn't say so."

Mr. Flowers, in answer to questions put by respondent's counsel, testified, among other things, as follows:

"*Q.* During that interview did Coveyeau tell you that the men who committed the crime with him were strangers, and lived in Chicago?

"*A.* He did not.

"*Q.* Did he not tell you at that time, in reply to your question as to whether he had confessed and named his accomplices, —did he not say: ' I was in a hurry, and pushed, and I named those men that I did name because I knew that they could be easily cleared, and that they could never convict them?'

"*A.* He did not state that to me.

"*Q.* In that conversation did he say or intimate that either Preston or Gallagher were his actual *bona fide* accomplices in that crime?

"*A.* That is rather an embarrassing question to put to me.

"*Q.* You were also the attorney for Preston?

"*A.* Yes, sir.

"*Q.* I can only put the question, and shall have to leave it to you. In that conversation did he say or intimate that either Preston and Gallagher were his actual *bona fide* accomplices in that crime?

"*A.* That is a very embarrassing question to put to me. My refusal to answer that question may intimate one thing or another, and I do not wish it to do that.

"*Q.* Well, we are in your hands. I hope you will see it your duty to try and subserve justice here, without any sacrifice of what you claim to be your personal privilege.

"*A.* The names of Gallagher and Preston were not mentioned."

Although the defense had some trouble in getting the answers, still it will be seen that all the matters inquired of Coveyeau in relation to this conversation were testified to by Flowers. Beyond that they were not authorized to go. Therefore we are satisfied that no harmful error was committed.

It is alleged as error that the court instructed the jury that the respondent might be convicted upon the testimony of Coveyeau, even if he was uncorroborated upon any material fact, if they believed his testimony beyond a reasonable doubt. A person charged with crime in this State can be convicted upon the evidence of an accomplice, without any corroboration or confirmation of such testimony from other sources. *People v. Jenness,* 5 Mich. 305; *Foster v. People,* 18 Id. 271; *People v. Schweitzer,* 23 Id. 301; *Fisher v. People,* 20 Id. 135; *Hamilton v. People,* 29 Id. 188.

It is objected that the circuit judge said to the jury:

"It appears from the testimony of Coveyeau, and there is no testimony to the contrary, that the defendant, Gallagher was armed."

It is urged that this fact was for the jury to find, and that it entered materially into the crime charged, making the offense of robbery aggravated in its character; and that

such statement of the court was untrue, as Coveyeau did not
testify that respondent was armed, and there was no evidence
to warrant any finding by the jury that he was armed.

It is true that Coveyeau did not testify that Gallagher was
armed, but there was plenty of evidence tending to show
that Coveyeau and some of the others had revolvers, and dis-
charged them, and beyond doubt Captain Holt was wounded
in the leg by one of them.

As a matter of law, if these four men were engaged in this
robbery, acting together and in concert, and one of them was
armed with a dangerous weapon, all the others were also guilty
of the crime charged, whether they were any of them armed
or not. Therefore this statement of the court could not
have affected the verdict.

Vrooman, an inmate of the county jail, awaiting trial on
a charge of larceny in the day-time from a school-house, gave
testimony for the defense that Coveyeau told him while in
such jail that the parties engaged with Coveyeau in the rob-
bery of Holt were in Chicago, and, when Vrooman asked
Coveyeau why he had implicated Preston and Gallagher,
responded:

"I don't give a G—d d—n for Gallagher; I am not going
over the road alone."

He refused to answer some questions on cross-examination,
for the reason that the answers might criminate him.

Counsel for respondent asked the following instruction:

"Because the witness Vrooman refused to answer any ques-
tion which he believed would tend to criminate him is no
good reason why he should not be believed as to what he
said."

The court did not give this request, and in that connection
said:

"As far as the testimony of Vrooman is concerned, gen-
tlemen of the jury, you can give it such credit as you think
it deserves."

This is assigned as error.

It was held by this Court in *Carne v. Litchfield*, 2 Mich. 344, in an action for an alleged assault and for false imprisonment, that the trial court erred in stating to the jury that the defendant Litchfield's refusal to answer a question propounded to him, on the ground that his answer might criminate him, was not evidence against him in the cause, yet it was impossible to prevent the jury from having the whole case, and knowing what was done in open court in the course of the trial before them, or to prevent counsel from commenting upon it; and this Court, by WHIPPLE, J., said:

"The ruling of the court excluding any references of guilt from Litchfield's refusal to answer questions, the answer to which might criminate him, was correct. The error of the court consists in making a suggestion, in the hearing of the jury, the effect of which might deprive the defendant of the full benefit of the rule of law which governs in such circumstances."

In *Foster v. People*, 18 Mich. 273, it was attempted to apply this ruling to the case of a witness who testified as an accomplice. The doctrine that no inference could be permitted against a witness because he asserts the privilege of refusing to answer a question on the ground that the answer might criminate him was again sustained, following *Carne v. Litchfield*, 2 Mich. 340, and citing *Rose v. Blackmore*, Ryan & M. 382; *Lloyd v. Passingham*, 16 Ves. 64; and *Knowles v. People*, 15 Mich. 408.

But it was held that the rule did not apply to a witness who was testifying as an accomplice, upon the ground that, by furnishing in the first instance criminating proof against himself as well as the accused, the witness could not stop short where he pleased in his story, but must be considered as having waived his privilege, and therefore must submit to the fullest and most searching inquiry.

The question came again before this Court in the case of *People v. Maunausau*, 60 Mich. 15 (26 N. W. Rep. 797).

The writer of this opinion in that case said (page 20) that, if the question was open to discussion in this State, he would be inclined to hold differently from the ruling in *Carne v. Litchfield, supra,* but, in deference to what seemed to be the settled law of the State, and to the opinions of the other members of the Court, acquiesced in the principle that no inference could be drawn against a witness on account of the claiming of his privilege of not answering. See, also *People v. Brewer,* 27 Mich. 134. But the present case can, I think, be distinguished from the others in this State, and the old rule preserved, if there be any virtue in it. In *Carne v. Litchfield,* 2 Mich. 340, and *Knowles v. People,* 15 Id. 408, the rule was applied to the case of the defendant testifying in his own behalf. In *Foster v. People,* 18 Mich. 266, the Court refused to apply the rule to a witness who was testifying as an accomplice, as heretofore stated. In *People v. Maunausau,* the witness Navarre was asked, on cross-examination, if he had not at a certain time stolen goods, and he refused to answer, claiming his privilege. The question he thus refused to answer was one not connected with or relating to his testimony in chief, but one propounded to him for the express purpose of showing that he had been guilty of a crime. Without doubt, in that case, he had a right to claim his privilege, and was doing so in good faith.

But here the case is different. Vrooman, who was in the Wayne county jail awaiting his trial on a charge of larceny, testified that, on a certain occasion in the jail, Coveyeau told him that the parties implicated with Coveyeau were in Chicago, and when witness asked Coveyeau why he had implicated Preston and Gallagher he replied:

"I don't give a G—d d—n for Gallagher; I am not going over the road alone."

It appeared that, after the time he claims Coveyeau told him this, Vrooman was in the same ward with Preston and Gallagher, but failed to inform them what Coveyeau had said

to him. He was asked, on cross-examination, why he did not tell them. He said at first:

"I decline to answer.

"*Q.* Why?

"*A.* That is all; I decline to answer.

"*Q.* I want to know why you decline to answer.

"*Mr. Straker* (counsel for respondent). Such a question or such an answer requires another question, and that is, would your answer criminate you?

"*Mr. Robison* (prosecuting attorney). Of course, if he says so, that is the end of it. I suggest that in the long experience this witness has had he does not need to have that suggestion from eminent counsel.

"*Mr. Straker.* The question should be put to him,—will your answer criminate or tend to criminate you?

"*Witness.* Yes, sir.

"*The Court.* That is entirely a personal privilege. Answer the question.

"*Q.* What was that you said?

"*A.* Well, it might go to criminate myself in some way. That is all I know about it.

"*Q.* It might go to criminate yourself in some way or other. That is the reason you did not tell Gallagher when you first went in there?

"*Mr. Straker.* No; he says it is the reason why he does not answer now.

"*Q.* Why didn't you tell Gallagher the first time you was in the first ward? Do you decline to answer that question?

"*A.* Yes, sir.

"*Q.* For what reason? (No answer).

"*Mr. Robison.* I wish the court would exercise the power that it has to make this witness answer that question.

"*Mr. Straker.* You can't make him open his mouth.

"*Q.* What is the reason you decline?

"*A.* I have my reasons.

"*Q.* What are they?

"*A.* I decline to answer the question.

"*Q.* Why do you decline. Would it tend to criminate you?

"*A.* It might in my future trial; yes, sir. * * * *

"*Q.* Why didn't you tell Preston?

"*A.* I decline to answer that.

"*Q.* Why do you decline to answer that?

"*A.* I told you just a moment ago.

"*Q*. Is it for the same reason?

"*A*. That is the same question you put to me a moment ago.

"*Q*. No; I asked you why you didn't tell Gallagher when you first went in the ward.

"*A*. I thought you said Preston.

"*Q*. Now I say, why didn't you tell Gallagher?

"*A*. The same reason.

"*Q*. What is the reason?

"*A*. It might go to hurt me in the future trial.

"*Q*. How could it hurt you in your future trial?

"*A*. Criminate me.

"*Q*. Do you want this jury to understand that it might hurt you in your future trial or criminate you?

"*Mr. Straker*. That is objected to.

"*The Court*. I think you have gone into this thing pretty fully."

It will be noticed that the question which the witness declined to answer was not one in any way directed against his character, or put for the purpose of impeaching him, or affecting his credibility because of anything wrong or criminal that he had done, but a legitimate inquiry, in the line of his direct testimony. It will also be seen that he did not think of claiming his privilege until it was suggested to him by one of the counsel for respondent.

It does not seem to me that this privilege was claimed in good faith. But, whether it was or not, it would certainly be an obstruction to the course of justice to hold that this witness could tell his story as he did in chief, and then refuse to answer a fair inquiry directly in the line of his testimony, and yet the jury must find that this declination must not be considered by them as any reason why they should discredit his story. If this be the extent of the rule, then all a witness need do to prevent any cross-examination at all is to decline to answer under his privilege, and his direct testimony must stand unaffected by his refusal to be cross-examined.

I cannot go as far as this; and, in the present case, think

the circuit judge was justified in refusing to give the proposed request, and in what he said as to Vrooman's testimony.

The testimony of respondent in the recorder's court in another trial—the trial of Preston for the same offense as the one charged against Gallagher in the case at bar—was properly admitted, not as impeaching testimony, but as his admissions; and it was competent also, although he did not testify as a witness in his own behalf in this case, to show that he had made contradictory statements at different times or in different places, in reference to his whereabouts on the night of the robbery, or of any other material fact affecting the issue of his guilt or innocence. The fact that Gallagher did not testify on the trial did not affect the introduction in evidence of his admissions or contradictory statements made outside of the trial, and before it took place.

Objection is made to the jurisdiction of the court. The trial was in the recorder's court of the city of Detroit, but it was presided over by the Hon. George Gartner, one of the circuit judges of the Wayne circuit.

The respondent's counsel claim that the record shows this assumed jurisdiction was obtained simply on the statement of Judge Gartner that he was requested to act by Judge Swift, of the recorder's court, the same being made of record on the second day of the trial, and after such jurisdiction had been assumed; and, further, that the Legislature has no power to authorize a circuit judge to act as judge of a municipal court.

Neither one of these objections is well grounded. The record shows that Judge Gartner was present as acting judge of the recorder's court of the city of Detroit, which is a sufficient showing under the law.

Act No. 456 of the Local Acts of 1887, which act is an amendment to the charter of the city of Detroit, provides (page 549) that—

"Either of the judges of the circuit court for the county of Wayne may act as judge of said recorder's court, when requested to do so by the recorder, or in case of the absence, sickness, or incapacity of said recorder, or when there is a vacancy in the office of recorder."

A simple request of the recorder is all that is necessary under this act to give a circuit judge of Wayne county authority to sit in his stead as judge of the recorder's court. The showing of the right to act by the record is within the statute, and besides, in the absence of any showing to the contrary, the right of Judge Gartner to act would be presumed. *Landon v. Comet,* 62 Mich. 92 (28 N. W. Rep. 788).

I can see no good reason why this act is not constitutional, as far as cases are concerned of which the circuit court had original jurisdiction before the passage of the act. Further than this it is not necessary to inquire for the purposes of this case.

The authority granted the recorder's court to hear, try, and determine criminal cases alleged to have been committed within the city of Detroit has been held within the Constitution. Section 1, Art. 6.

This jurisdiction before the creation of the recorder's court was in the circuit court for the county of Wayne. If the Legislature had the power to divest the circuit court of its original jurisdiction of this class of cases, it has also the power to restore such jurisdiction, if it sees fit in the future to do so; and, having this power, there seems to be no valid reason why it cannot in certain cases provide that a judge of said circuit court may sit temporarily as judge of the recorder's court.

The sixth assignment of error is that—

" The verdict was contrary to the law and to the evidence and the weight of evidence, and because the sentence was excessive, and not in proportion to the gravity of the offense."

It is sufficient to say in this respect that we have thus far

found no errors of law to the respondent's prejudice, as heretofore shown; and we have examined fully the whole case, and are satisfied that the verdict was a just one, and that the respondent's sentence is none too heavy in a case like this, where robbery would have been supplemented with murder had the aim of the robbers been more accurate.

The judgment is affirmed.

CHAMPLIN, CAMPBELL, and LONG, JJ., concurred. SHERWOOD, C. J., did not sit.